IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-10080-01-WEB |
| | ) | |
| ANTHONY R. ROMERO, | ) | |
| a/k/a Victor Hugo Gonzales, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Memorandum and Order**

This matter came before the court on September 22, 2005, for an evidentiary hearing on the defendant's motion to suppress evidence. The court took the motion under advisement at the conclusion of the hearing. For the reasons stated herein, the court finds that the motion to suppress should be denied.

I. *Facts.*

The court finds the following facts from the evidence presented at the hearing. In the early morning hours of April 10, 2005, Wichita Police dispatchers received an emergency call about a domestic disturbance in the 1800 block of S. Madison street in Wichita. Officers were dispatched to the scene. Wichita Police Department Sgt. James Espinoza was driving about two blocks away from scene when he saw an individual running south on the street. Espinoza followed the man and found him on the next street over hiding in some bushes. Espinoza drew his gun and ordered the man out of the bushes. He patted the man down and had him sit on the curb. Espinoza was able to converse with the man in English. He saw no indication that the man was intoxicated.

The man said his name was Jose Gonzales, and that he had been running because he and his brother had been in an altercation at a bar and there were people chasing him.  He said his brother had been hurt and was at a nearby residence, although he could not remember which house.  By this time other officers had arrived at the scene, including Officer Dallas Boone.  The man again told the officers his name was Jose Gonzales and gave his date of birth as April 27, 1978.  Boone ran the name through the WPD's computerized "SPIDER" database but found nothing.

Meanwhile, Sgt. Espinoza joined other officers who were at the scene of the domestic disturbance on Madison street.  After speaking with a neighbor who had phoned the police, WPD Officer Isis Izzard and several other officers knocked on the door of the house where the disturbance had occurred.  They had to knock repeatedly before someone answered.  Eventually, Ms. Michelle Montoya answered the door and let Izzard and the other officers enter.  Several officers, including Sgt. Espinoza, fanned out through the residence to determine who was in the house and to ensure the officers' safety.  They briefly went into each room and looked into areas, including closets, where a person might be hiding.  The officers found Ms. Montoya's three young children in the house.  Ms. Montoya reported that she and her boyfriend, Anthony Romero, had a fight and that Romero left the house shortly before the officers arrived.  Sgt. Espinoza recognized the name Anthony Romero and suspected that he might be involved in drug trafficking.  When Montoya described Romero, Espinoza concluded he was probably the man being detained by officers a couple of blocks away.  At some point Espinoza radioed the officers and asked them to bring the man to Ms. Montoya's house.

Officers drove the man over to the residence on Madison.  He was in the back of a patrol car but was not handcuffed.  He was still insisting that his name was Jose Gonzales.  When officers told him that

he could face charges if he was giving them a false name, he changed his story and told them that his name

was actually Victor Gonzales and that his date of birth was July 7, 1978.

At Sgt. Espinoza's request, Ms. Montoya agreed to come out of the house to see if she could

identify the man in the patrol car. She did so, and after seeing him told the officers that it was her boyfriend,

Anthony Romero. The man was in fact Anthony Romero, the defendant in this case. The defendant

claimed, however, that Ms. Montoya was lying, and that he was not Anthony Romero. When officers ran

Romero's name through the SPIDER database, they found there were two outstanding felony warrants for

his arrest. When the defendant still insisted he was not Romero, the officers asked him if he had any

identification, and he said he had some inside the residence that would prove he was Victor Gonzales.

After the officers learned of the outstanding arrest warrants, they handcuffed the defendant and placed him

in the back of the patrol car.

Back inside the residence, Sgt. Espinoza talked to Ms. Montoya. He told her he suspected the

defendant of having drugs in the house and asked for her permission to search the house. He said this

would be a great opportunity to make sure there were no drugs in the house around her young children.

Montoya said that would be okay with her, but that the defendant kept his belongings in a closet and in a

bedroom of the house and that the officers would have to get his permission to search those areas.

Espinoza went back outside and spoke to the defendant. He told the defendant they needed to establish

his identity and they wanted to look in the house for identification. The defendant said that was okay,

adding that he had some identification inside the door. Espinoza said Ms. Montoya had informed him that

the defendant kept some of his things in a closet, and Espinoza asked if it would be all right if they looked

through there to clear this thing up. The defendant said it would be okay. Espinoza in fact wanted to

3

search for identification, but he also wanted to search for drugs.  He did not say anything to the defendant about drugs, however, because he did not want to alert the defendant to his suspicions about drug activity.

Espinoza went back in the house to the closet where the defendant kept his belongings.  It was a "linen type" closet, located in an open area between two bedrooms.  Espinoza opened the closet door and saw some clothes on hangers and some folded on the shelves.  He began on the top shelf, lifting up the folded shirts and looking underneath and feeling any pockets to see if they contained any type of identification.  Espinoza found a white "Walmart type" shopping bag under a piece of clothing on the shelf. He could not see through the bag.  The bag was big enough that it could have contained a wallet, receipt, bill, or other item of identification.  Espinoza unfolded the bag and saw a clear plastic baggie containing what appeared to be rocks of crack cocaine.  Espinoza seized the item, which now forms the basis of the charge in Count 1 of the Superseding Indictment.

The defendant's girlfriend, Michelle Montoya, testified at the suppression hearing.  She said that prior to the incident at the house she and the defendant had been at a family gathering where the defendant had been drinking heavily.  She also said she did not understand that the officers wanted to look for identification, and that when they asked her about permission to search for drugs, she told them they would have to get the defendant's permission to go through his things.  Her testimony regarding consent was somewhat inconsistent, but she consistently testified that she told the officers they could search through the defendant's areas of the house, including the closet, if they got his permission.  The evidence shows that the officers did in fact obtain the defendant's permission to search that area.  She testified that Sgt. Espinoza was going in and out of the house at this time.  She said that the closet where the drugs were found was an area controlled by the defendant and that if the officers had permission from him to search that area it

was okay with her.  She testified that she knows the defendant by two names -- Anthony Romero and Victor Gonzales -- and that he goes by both names.

The defendant Anthony Romero also testified at the hearing.  He testified, through an interpreter, that he speaks very little English.  He said that when the officers asked for his permission to search the house, he did not understand why they wanted to search, and he denied giving them permission to search the closet.  He said he gave officers a false name because he knew he had warrants out for his arrest and he was scared.

II.  *Motion to Suppress*.

The defendant argues that the search of his closet was unreasonable under the Fourth Amendment. He contends that neither he nor Ms. Montoya consented to the search.  Moreover, he argues that he was drunk at the time and was incapable of giving voluntary consent.  Also, he contends the officers deceived him by stating that they were looking for his identification, and that such trickery would void any perceived consent.  *Citing United States v. Hernandez*, 93 F.3d 1493, 1500 (10th Cir. 1996).  Finally, he argues that the officers exceeded the scope of the purported consent by searching the closet shelf and opening what he refers to as a "wrapped package."

The government contends that the search was properly supported by voluntary consent.  It further contends that the officers' search was within the scope of the consent granted.

III.  *Discussion*.

The Fourth Amendment provides in part that "the right of the people to be secure in their ... houses, ... against unreasonable searches and seizures, shall not be violated...."  U.S. Const., Amend. IV.  The physical entry of the house is the chief evil against which the Fourth Amendment is directed.  *See Payton*

5

*v. New York*, 445 U.S. 573, 585 (1980). A warrantless entry or search of a house is per se unreasonable unless a specifically defined exception--such as valid consent--is present.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

To be valid, consent must be freely and voluntarily given.  *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir.1999).  Voluntariness is a question of fact to be determined from the totality of the circumstances.  *Schneckloth*, 412 U.S. at 248-49.  The government must prove by a preponderance of the evidence that consent was freely and voluntarily given.  *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir.1993). To meet its burden, the government first must present clear and positive testimony that consent was unequivocal and freely and intelligently given.  *United States v. Pena*, 143 F.3d 1363, 1367 (10th Cir.1998).  The government also must prove that the officers used no implied or express duress or coercion in obtaining the consent. *Id*. The government does not discharge its burden "by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 549 (1968).

The court has no trouble finding from the evidence presented that Sgt. Espinoza asked the defendant for permission to search in the closet for identification.  Nothwithstanding defendant's denial that the police ever asked him for permission to search, the weight of the evidence is clear that Espinoza asked him specifically about searching that area.[1]  Moreover, the court finds credible Sgt. Espinoza's testimony that he specifically asked the defendant if he could look through his belongings in the closet for

---

[1] The court rejects defendant's claim that his interrogation of August 2, 2005, shows he did not consent to the search.  During that interrogation, defendant claimed that he told the officers there was identification in the house but did not give them permission to look for it.  When asked more particularly, however, defendant stated the he could not remember whether he gave them permission to look. Def. Exh. B at p. 7.  At any rate, the court finds that Sgt. Espinoza's testimony on the issues of consent was more credible than the defendant's.

identification, and that the defendant responded unequivocally by saying he could.

The closer question is whether the consent given by the defendant was voluntary.  The defendant was in custody at the time of the consent, a factor that tends to weigh against a finding of voluntariness due to the coercion inherent in a custodial setting.  *See e.g., United States v. Shields*, 573 F.2d 18, (10th Cir. 1978) (this court has recognized that an alleged voluntary consent to search must be viewed with caution and misgivings if given after arrest).  On the other hand, the defendant was on a public street in front of his home at the time of the consent, and the officers did not use any overt display of force or coercion to gain the consent.  The interaction between the officer and the defendant was cordial and  courteous at the time of the request.  And although the officers did not inform the defendant that he had a right to refuse a search, the manner in which the officer sought consent conveyed that he was seeking the defendant's permission for a search and that the defendant was not obligated to give consent.  Moreover, the evidence shows that the defendant is a competent adult who understood the circumstances and the nature of the officer's request.  Although the defendant may not be completely fluent in English, the evidence persuades the court that the defendant understood the request, that he was able to communicate his thoughts to the officer, and that he made a decision of his own free will to grant permission to search the closet for his identification. The court notes that the evidence suggests the defendant himself suggested to the officers that they could find his identification in the house, a fact which tends to show that he was willing to let them look in the house for identification.  Also, despite the testimony of the defendant and his girlfriend about how much alcohol the defendant drank prior to this incident, there is no credible evidence that defendant's ability to understand or to make a voluntary decision was impaired to any significant degree by alcohol.

Sgt. Espinoza candidly admitted that at the time he asked for consent to search he wanted to search

7

for drugs as well as for identification.  He said nothing to the defendant about drugs, however, instead indicating that his interest was merely in finding identification.  In some circumstances, a misrepresentation by an officer as to the purpose of a proposed search can contribute to a finding that a consent is involuntary.  *See e.g., United States v. Carter*,  884 F.2d 368, 375 (8th Cir. 1989);  *United States v. Alexander*, 390 F.2d 101 (5th Cir. 1968) ("[I]ntimidation and deceit are not the norms of voluntarism.  In order for the response to be free, the stimulus must be devoid of mendacity.").  *See also* W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.2(n) (4th ed. 2004) and *United States v. Glover*, 104 F.3d 1570, 1583-84 (10th Cir. 1987) ("In determining whether a consent to search is voluntary, a court should consider the following: physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant.").  In this instance, the officer's request could possibly be characterized as a "half-truth," because his representations were in fact truthful:  he wanted and intended to search for identification, but he did not disclose that he also had suspicions and an interest in finding drugs.  Nevertheless, under the totality of the circumstances, the court concludes that the resulting consent was voluntary.  As noted above, the defendant is a competent adult who understood the nature of the request and even encouraged the police at one point to look for identification in the house.  Significantly, the defendant was aware that by asking to search for identification, the officers were seeking evidence that could be incriminating in nature, as they had previously warned him that misrepresenting his identity would be a criminal offense.   The officer did not use any improper means of force or intimidation that would raise a question about the voluntary nature of defendant's decision to permit a search.  And just as the courts have rejected the view that police officers must always inform citizens of their right to refuse when seeking

permission to conduct a warrantless consent search, likewise there is no *per se* requirement that an officer must disclose all of his suspicions and/or explain all of the possible ramifications of allowing a particular search. *Cf. Moran v. Burbine*, 475 U.S. 412 (1986) (in determining whether waiver of *Miranda* rights is voluntary, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights; we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights). The question here "is not whether the [defendant] acted in [his] ultimate self-interest, but whether [he] acted voluntarily." *United States v. Mendenhall*, 446 U.S. 544, 559 (1980). The defendant understood what the officer was asking and understood that by giving consent he was permitting the officer to look for evidence in a closet where drugs were located. Given the totality of the circumstances, including defendant's understanding of the request to search, his understanding of the consequences flowing from his consent, and the absence of any evidence that his consent was a product of improper coercion, the court concludes that his consent was voluntary. The fact that the officer did not inform the defendant about his suspicions of drugs did not render defendant's decision to permit the search involuntary. This was an essentially free and unconstrained choice, and the officer's additional suspicions or intent cannot be said to render the defendant's choice involuntary. *Cf. United States v. Andrews*, 746 F.2d 247, 250 (5th Cir. 1984) (although misrepresentation as to purpose of search was a factor to be considered, circumstances showed that consent was voluntary), *overruled in part on other grounds by United States v. Hurtado*, 905 F.2d 74 (5th Cir. 1990); *United States v. White*, 706 F.2d 806, 807-08 (7th Cir. 1983) (officer's subjective intent to search for money did not render involuntary a consent to search for drugs).

In addition to finding the consent was voluntary, the court also finds that the search was within the scope of the consent granted. The appropriate scope of a search is generally defined by its expressed object. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). It is limited by the breadth of any consent given. *United States v. Anderson*, 114 F.3d 1059, 1065 (10th Cir.1997). In determining the scope of consent, the courts apply an "objective reasonableness test" that asks: What would the typical reasonable person have understood by the exchange between the officer and the suspect? *See Jimeno*, 500 U.S. at 251. In this instance, the expressed object of the search was to look for the defendant's identification. A reasonable person would have understood the exchange between the officer and the defendant to mean that the officer was granted permission to look anywhere in the closet -- and within any item in the closet -- that might reasonably contain identification. *See Jimeno*, 500 U.S. at 251 (consent to search for specific items includes consent to search those areas or containers that might reasonably contain those items). That is precisely what the officer did. The white plastic "Walmart type" bag discovered by Sgt. Espinoza among the clothes in the closet was the type and size of a container that could reasonably have contained some form of identification, such as a wallet, a driver's license, mail, or a credit card receipt. The officer was thus entitled to open the sack, and when he did so he saw contraband in plain view and was entitled to seize it. *United States v. Kimoana*, 383 F.3d 1215, 1224 (10th Cir. 2004) (where consent was given to search a room for a motel key, it did not matter that officers looking under a mattress were actually searching for weapons rather than a key, because a key could fit under the mattress where the officers looked, and the officers' subjective intent was irrelevant).[2] *See also United States v. Thomas*, 372 F.3d 1173, 1178 (10th

---

[2] Just as in the *Kimoana* case, there is no evidence here that the officer "used an unreasonable amount of force or intensity in executing the search" for defendant's identification. *See Kimoana*, 383 F.3d

Cir. 2004) (discussing requirements of plain view doctrine).  Accordingly, the court rejects the defendant's

argument that Sgt. Espinoza exceeded the scope of consent by searching among the clothes in the closet

or by opening the opaque plastic bag that held the cocaine.

     IV.  *Conclusion*.

     The defendant's Motion to Suppress Evidence (Doc. 7) is DENIED.  IT IS SO ORDERED this

<u>19th</u>   Day of October, 2005, at Wichita, Ks.

               <u>s/Wesley E. Brown</u>
               Wesley E. Brown
               U.S. Senior District Judge

---

at 1224, n.6.